UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 4:18-cr-320 AGF (PLC) |
| | ) | |
| MICHAEL GLADNEY, | ) | |
| | ) | |
| Defendant. | ) | |

**SENTENCING MEMORANDUM**

COMES NOW Defendant, Michael Gladney (Gladney), by and through counsel, and files the following memorandum for sentencing.

## I.      Introduction

On April 18, 2018, the government filed a two-count indictment, alleging Gladney violated Title 18 U.S.C. §§ 1951(a) and 924(c)(1)(A). *See* Doc. Text #18. On January 30, 2020, Gladney pled guilty to the indictment pursuant to a written agreement. *See* Presentence Investigation Report at ¶ 1 [hereinafter PSR]. In the agreement, the parties estimated a count-one total offense level of 22, a criminal history category of I, and a corresponding guideline range of 41 to 51 months. The PSR confirms these estimates, *see PSR* at ¶¶ 29, 42, 72, and, like the plea agreement, adds 84 months to the low- and high-end of this range to account for the consecutive mandatory minimum penalty attached to count two. *See id.* at ¶ 72. As a result, Gladney's total range rises to 125 to 135 months. *See id.*

This total range would look quite different without the 84-month count two add-on penalty. But it would still account for Gladney's brandishing of a firearm. Without count two, U.S.S.G. § 2B3.1 would add five to Gladney's total offense level of 22, increase this number to 27, and yield an

1

advisory guideline range of 70 to 87 months — 55 and 48 months below the low- and high-end of the range as calculated with § 924(c)'s 84-month add-on. *See* U.S.S.G. § 2B3.1(b)(2)(C).

As discussed below, a sentence consistent with this 70 to 87-month range will promote the Sentencing Reform Act's goals of proportionate, individualized, race-neutral sentencing; a sentence between 125 to 135 months will not. In addition, a sentence consistent with a 70 to 87-month range will account for considerations the guidelines disregard altogether. For these reasons and others, a sentence of 85 to 87 months is appropriate in this case.[1]

## II.   A Sentence of 85 to 87 Months Will Promote Just Punishment in General and Proportional, Individualized, Race-Neutral Sentencing in Particular; a Sentence of 125 to 135 Months Will Not.

Like the Sentencing Reform Act of 1984 ("the SRA"), the guidelines emphasize proportional punishment, largely through rules which prescribe incremental increases in punishment based on harm- or blame-increasing facts. *See* U.S.S.G.  Ch. 1 Pt. A, intro., p.s. 3 ("Congress sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity.").

For the most part, the "specific offense characteristics" included in almost every Chapter Two guideline embody these rules. *See e.g.*, *United States v. Mojica*, 214 F.3d 1169, 1172 (10th Cir. 2000) ("The purpose of the 'specific offense characteristics' guidelines...is to make punishment proportional to the specific illegal conduct of a particular defendant...."); *see also United States v. Juan*, 59 F.Supp.2d 210, 216 (D. Mass. 1999) ("To achieve proportionality, the Commission identified potentially relevant features of criminal conduct referred to as 'specific offense characteristics,' that

---

[1] Because count two requires a minimum 84-month sentence, the lowest sentence this court can impose is 84 months and one day. *See Dean v. United States*, 137 S.Ct. 1170, 1177-78 (2017) ("Nothing in § 924(c) restricts the authority conferred on sentencing courts by §3553(a) and the related provisions to consider a sentence imposed under § 924(c) when calculating a just sentence for the predicate count.").

would allow judges to tailor sentences according to each participant's role in the offense, in effect making the punishment fit the crime.").

Subsection (b)(2) of § 2B3.1, the robbery guideline, typifies these rules and illustrates how they work. Among other things, subsection (b)(2) applies an offense level increase of five to offenders like Gladney who brandish a firearm during a robbery offense and, in so doing, reflects the harm weapons add to robbery offenses, the added blameworthiness of offenders who brandish them, and the greater punishment those offenders merit relative to offenders who commit weaponless robbery offenses.

Without count two, subsection (b)(2) would add five to Gladney's total offense level and increase his guideline range from 41 to 51 to 70 to 87 months, increases of 29 and 36 months to the low- and high-end of his range. But § 2B3.1(b)(2) does not apply in this case because count two's 84-month minimum penalty replaces it. *See* USSG § 3D1.1 cmt n. 2. As a result, Gladney's guideline range increases from 41 to 51 to 125 to 135 months, an increase of 84 months to the low- and high-end of his range. According to the United States Sentencing Commission (the Commission), this 84-month add-on runs counter to Commission's emphasis on proportionate sentencing, "a fundamental premise for just punishment, and a primary goal of the Sentencing Reform Act." [2]:

> In contrast to mandatory minimum penalties, the guidelines prescribe proportional individualized sentences based on many factors relating to the seriousness of the offense, the harms associated with the commission of the offense, the culpability of the offender, and the criminal history and other characteristics of the offender. This multi-dimensional approach to sentencing seeks to avoid the problems inherent in the structure of mandatory minimum penalties and, for this reason, best serves the purposes of the Sentencing Reform Act.

---

[2] *See Neal v. United States*, 516 U.S. 284, 292 (1996) ("The sentencing guidelines system is essentially a system of finely calibrated sentences. For example, as the quantity of drugs increases, there is a proportional increase in the sentence. In marked contrast, the mandatory minimums are essentially a flat, tariff-like approach to sentencing. Whereas guidelines seek smooth continuum, mandatory minimums result in 'cliffs.' The 'cliffs' that result from mandatory minimums compromise proportionality, a fundamental premise for just punishment, and a primary goal of the Sentencing Reform Act."

United States Sentencing Commission, 2011 Report to Congress, Mandatory Minimum Penalties in the Federal Criminal Justice System, Ch. 12, p. 346 (2011) [hereinafter 2011 Report].

Yet, according to the Commission, § 924(c) works more mischief still:  it undermines individualized sentencing and promotes unwarranted sentencing uniformity. Specific offense characteristics like § 2B3.1(b)(2) operate in the context of the guidelines' two primary structural features, the offense level and criminal history axes. Section 2B3.1(b)(2)'s effect on an offender thus turns on these features. Comparison of two hypothetical offenders illustrates the point.

Like Gladney, Offender A has an offense level of 22, a criminal history category of I, and an advisory guideline range of 41-51 months. As it would for Gladney, subsection (b)(2) increases Offender A's total offense level to 27 and yields an adjusted guideline range of 70-87 months, increases of 29 and 36 months to the low- and high-end of his unadjusted 41 to 51-month range.

Offender B also has an offense level of 22. But his criminal history category is IV and his guideline range is 63 to 78 months. As with Offender A, subsection (b)(2) increases Offender B's total offense level to 27, but it yields an adjusted guideline range of 100-125 months – increases of 37 and 47 months to the low- and high-end of his range. This proportionately greater outcome follows from Offender B's more serious criminal history category relative to Offender A and it would be proportionately greater still if Offender B landed at a higher point on either the offense level or criminal history axis.

Section 924(c) does not work with this same subtlety. It disregards all offense and offender differences and applies the same 84-month increase to everyone. This result does not further individualized sentencing. In fact, it does just the opposite. It imposes identical outcomes on factually dissimilar offenders and, in the process, promotes both unfairness and unwarranted sentencing uniformity. *See* 1991 Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System, Key Findings ("Under the guidelines, offenders classified as similar

4

receive similar sentences; under mandatory minimums, offenders seemingly not similar nonetheless receive similar sentences. It thus appears that an unintended effect of mandatory minimums is unwarranted sentencing uniformity."); *see also* United States Sentencing Commission, Fifteen Years of Guidelines Sentencing:  As Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform at 113 (2004) ("Fair sentencing is individualized sentencing."); *see id.*, (noting unwarranted sentencing similarity is no more justified than unwarranted sentencing disparity).

To these several vices, § 924(c) adds one more. It contributes to "perceptions of unfairness and unwarranted [racial] disparity." According to the Commission,

> [t]here are notable demographic differences in the application of mandatory minimum penalties for firearm offenses. Black offenders constitute the majority of offenders convicted of an offense under section 924(c) (55.9%) and the majority of offenders who remain subject to its mandatory minimum penalties at sentencing (55.7%). Black offenders constitute an even greater proportion (61.0%) of offenders convicted of multiple counts of an offense under section 924(c). By contrast, White and Hispanic offenders constitute only 15.1 and 21.2 percent of offenders convicted of multiple counts of an offense under section 924(c), respectively. The effects of these demographic differences are two-fold. First, to the extent the mandatory minimum penalties for firearm offenses are unduly severe, these effects fall on Black offenders to a greater degree than on offenders in other racial groups. Second, as in drug offenses, demographic differences in the application of mandatory minimum penalties for firearm offenses create perceptions of unfairness and unwarranted disparity.

2011 Report at 363-64 (2011).[3]

---

[3] In 2019, Black offenders still constituted the vast majority of offenders convicted of an offense under § 924(c) (52.6%). *See* United States Sentencing Commission, Quick Facts, 18 U.S.C. § 924(c) Firearms Offenses at 1 (May 2020). In contrast, White, Hispanic, and "Other" races represented 21.1%, 23.7%, and 2.6% of convicted § 924(c) offenders, respectively. *See id.*

For these reasons, a sentence of 85 to 87 months will better promote just punishment in general — and proportional, individualized, race-neutral sentencing in particular — than will a sentence of 125 months or more.

### III.   Gladney's History and Characteristics Support an 85 to 87-Month Sentence

Gladney is the oldest of ten children. *See* PSR at ¶ 48. His mother, Diane, is a nursing home employee of 30-plus years. His father, Michael Sr., was a mechanic who died when Gladney was 12. *See id.* According to his siblings, Diane grew depressed after her husband died and his death was difficult for the whole family. In his absence, many household duties fell to Gladney — cooking, cleaning, and hair cutting, among them.

According to Gladney, he graduated from high school in 1997. *See id.* at 60. According to the Missouri Board of Probation and Parole, he completed only three years of high school. *See id.* Records requests from counsel and the probation office have gone unanswered. *See id.* Gladney's actual educational history is thus unknown. Either way, he cannot read, but he is not unintelligent.

At 25, Gladney's brother Maurice died from an asthma attack. *See id.* at ¶ 48. Maurice was 22 at the time. On average, ten Americans die from asthma attacks each day. *See* Asthma and Allergy Foundation of America, Asthma Facts and Figures available at https://aafa.ord/asthma-facts/. Unsurprisingly, asthma deaths strongly correlate with race, poverty, and poor education. *See id.* And, for the most part, they are avoidable with proper treatment. *See id.* Like his father's death, Maurice's death proved difficult for Gladney to accept. Gladney has never had counseling for either trauma or for the general trauma associated with a childhood spent in an "environment filled with poverty and drugs." PSR at ¶ 48.

Gladney has nine biological children and four children he helped raise. *See id.* at ¶¶ 49-52. The children range in age from 3 to 22 and, by all accounts, he loves them dearly. Without question, they are his most frequent subject of conversation. They are also his greatest source of his self-

reproach, since his choices have multiplied their burdens and made their life challenges more difficult.

To his credit, Gladney is not shy of hard work. *See id.* at ¶¶ 66-67. In fact, he's worked throughout his life. But a workplace injury in 2004 has, over time, limited his capacity to earn a living from the manual labor he's typically performed. *See id.* at ¶¶ 56, 66-67. The injury also led to his long-term abuse of opioid prescriptions. *See id.* at ¶ 59. Gladney has not worked since 2017. *See id.* at ¶ 65.

Notably, Gladney has no past history of violence and a comparatively minor criminal history with two non-violent felony convictions from 21 and nine years ago for which he received and successfully completed probation. *See* PSR at ¶¶ 36-43. He's served no prior term of imprisonment,[4] *see id.*, and, if sentenced to 85 to 87 months, will be just shy of 50 when he's released — an age that will place him among the least likely federal offenders to reoffend. *See* United States Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, Exhibit 9, at 28 (May 2004) (noting criminal history category I offenders between the age of 41 and 50 and over 50 have recidivism rates of 6.9% and 6.2%, respectively.)

For the past 30 months, Gladney has been incarcerated in the St. Charles County Jail. He's incurred no disciplinary action in that time and has conducted himself as a model detainee. In fact, last year, he and two others stopped a suicide by an inmate who grew despondent when his mother died. *See* Exhibit 1 [St. Charles County Department of Corrections Incident Report (Feb. 12, 2019)]. According to those who know him, this act was more consistent Gladney's character than was involvement in the instant offense.

---

[4] *See United States v. Baker*, 445 F.3d 987, 900 (7th Cir. 2006) (a district court may reasonably conclude that a term of imprisonment will mean more and "have a greater impact" on an offender who has never been imprisoned than on an offender who has already served a term of imprisonment); *United States v. Qualls*, 373 F.Supp.2d 873, 877 (E.D. Wisc. 2005) ("Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend.").

## IV.     Conclusion

Gladney committed a serious offense. But a sentence of 85 to 87 months will account for his full offense conduct and yield a sentence more consistent with 18 U.S.C. § 3553(a) than will as sentence of 125 months or more. *See* 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes [of sentencing]." A sentence of 85 to 87 months will promote just punishment in general and proportional, individualized, race-neutral sentencing in particular. According to the Commission, a sentence of 125 months or more will not. Similarly, a sentence of 85 to 87 months will promote incapacitation consistent with § 3553(a). A sentence of 125 to 135 months will not, a claim supported by the Commission's evidenced-based assessment of Gladney's exceedingly low-likelihood of reoffending. A sentence of 85 to 87 months will also better promote general deterrence, given § 3553(a)'s mandate and the dearth of evidence to support the theory of deterrence through sentencing severity.[5]

---

[5] Little credible evidence suggests increases in sentence severity reduce crime through general deterrence. *See, e.g.*, Cheryl Marie Webster and Anthony N. Doob, Searching for Sasquatch: Deterrence of Crime through Sentence Severity, The Oxford Handbook of Sentencing and Corrections, p. 174-175, Oxford University Press (2012) ("Despite enormous research efforts, no credible consistent body of evidence has been found to support the conclusion that harsher sentences (within ranges conceivable in Western democracies) achieve marginal deterrent effects on crime.");Valerie Wright, Ph.D., Research Analyst, The Sentencing Project, Deterrence in Criminal Justice: Evaluating Certainty Versus Severity of Punishment at 9 (2010) ("Existing evidence does not support any significant public safety benefit of the practice of increasing the severity of sentences by imposing longer prison terms. In fact, research findings imply that increasingly lengthy prison terms are counterproductive."); Anthony N. Doob, Cheryl Marie Webster and Rosemary Gartner, Issues Related to Harsh Sentences and Mandatory Minimum Sentences:  General Deterrence and Incapacitation, at A-3, University of Toronto, Centre for Criminology & Social Studies, (2014) ("At this point, we think it fair to say that we know of no reputable criminologist who has looked carefully at the overall body of research literature on 'deterrence through sentencing' who believes that crime rates will be reduced, through deterrence, by raising the severity of sentences handed down in criminal courts."); Michael Tonry, Learning from the Limitations of Deterrence Research, Chicago Journals, Crime and Justice, Vol. 37, No. 1, University of Chicago Press (2008), pp 301-302 ("It is unclear to me which is more surprising: that so little credible evidence exists that criminal behavior is much affected by changes in punishment policies or that policy makers continue to believe that policy changes significantly affect behavior and that research continues to test for their crime-preventive effects.")

"Three National Academy of Science panels, all appointed by Republican presidents, [have] reached [this] conclusion, as has every major survey of the evidence."  Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research 28-29 (2006).

Research abroad has concluded the same, *see e.g.,* Andrew Von Hirsch, et. al., Cambridge University, Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999) (finding no data to support a statistically significant correlation between increases in sentence severity and crime rate reductions); *see also* David Farrington, et al., Changes in Crime and Punishment in America, England, and Sweden between the 1980s and the 1990s, Studies in Crime Prevention, 3:104-131 (1994) (comparing crime and punishment trends in the United States, England, and Sweden and failing to detect any decrease in crime rates as a result of increases in sentence severity), as has more recent research

For these reasons and those discussed above, a sentence of 85 to 87 months with conditions of supervised release to include mental health counseling, cognitive behavioral therapy, and vocational training will better promote the purposes of sentencing, the mandate of 18 U.S.C. § 3553(a), and the individualized form of sentencing envisioned by *United States v. Booker*, 542 U.S. 220 (2005), than will a sentence of 125 months or more.

Respectfully submitted,

By: */s/ Adam D. Fein*

ADAM D. FEIN, #52255 MO
Attorney for Defendant
120 S. Central Avenue, Suite 130
Clayton, Missouri 63105
(314) 862-4332
afein@rsflawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2020 the foregoing was electronically filed with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Ms. Jennifer Szczucinski, Assistant United States Attorney.

---

published in Federal Probation. *See e.g.*, Kelli D. Tomlinson, An Examination of Deterrence Theory: Where do We Stand?, 8-Dec. Fed. Probation 33 (2016) (concluding "non-legal factors, such as marriage, employment, peers, morality, disapproval from loved ones, ostracism, and shame, hav[e] more impact on conformity than do sanctions and threats.").